1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CARLIS A. GRAGG,

11              Petitioner,                No. CIV S-08-2162 GGH P

12        vs.

13   K. PROSPER, et al.,                   ORDER

14              Respondents.

15   _____/

16   I.  Introduction

17              Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  On September 29, 2008, petitioner filed his consent to the

19   jurisdiction of the undersigned (docket #4).  On November 6, 2008, respondent filed her consent

20   to the jurisdiction of the undersigned (docket #10).  Petitioner challenges his 2006 conviction for

21   making a criminal threat in violation of Cal. Penal Code § 422.  Petitioner is serving a sentence

22   of eight years imprisonment.

23              The petition raises two claims: 1) admission of the victim's statements violated

24   the Confrontation Clause; and 2) admission of the victim's statements violated state law. [1]

25   ────────────────────

26        [1]  In the state appellate court, petitioner raised an issue that the victim had been coerced
     by the prosecutor into not testifying.  This claim was rejected by the state courts.  Petitioner does

1

1       After carefully reviewing the record, the petition is denied.

2   II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

3       The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

4   petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

5   138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

6   AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

7   standards of review to be used by a federal habeas court in assessing a state court's adjudication

8   of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

9   (9th Cir. 1997).

10      In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

11  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

12  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

13  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

14  "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

15  to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

16  Court on a point of law, or (2) if the state court case is materially indistinguishable from a

17  Supreme Court case, i.e., on point factually, yet the legal result is opposite.

18      "Unreasonable application" of established law, on the other hand, applies to

19  mixed questions of law and fact, that is, the application of law to fact where there are no factually

20  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

21  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

22  AEDPA standard of review which directs deference to be paid to state court decisions.  While the

23  deference is not blindly automatic, "the most important point is that an *unreasonable* application

---

24

25  not raise that issue herein as a headlined issue.  There is the briefest reference to the issue in that
    part of the state appellate brief attached to the petition at p. 25, which actually refers the reader to
    a part of the brief not raising the issue at all.  There is no indication that such an issue was

26  exhausted in the state supreme court.  Therefore, the undersigned will not reach the issue.

1   of federal law is different from an incorrect application of law....[A] federal habeas court may not

2   issue the writ simply because that court concludes in its independent judgment that the relevant

3   state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

4   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

5   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

6   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

7   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

8           The state courts need not have cited to federal authority, or even have indicated

9   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

10  Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

11  contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

12  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

13  occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

14  established Supreme Court authority reviewed must be a pronouncement on constitutional

15  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

16  binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

17          However, where the state courts have not addressed the constitutional issue in

18  dispute in any reasoned opinion, the federal court will independently review the record in

19  adjudication of that issue.  "Independent review of the record is not de novo review of the

20  constitutional issue, but rather, the only method by which we can determine whether a silent state

21  court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

22  2003).

23          The last state court to issue a reasoned decision addressing petitioner's claims was

24  the California Court of Appeal.  Respondent's Lodged Documents D, F.  Accordingly, the court

25  considers whether the denial of these claims by the California Court of Appeal was an

26  unreasonable application of clearly established Supreme Court authority.  Shackleford v.

3

1  Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (when reviewing a state court's summary

2  denial of a claim, the court "looks through" the summary disposition to the last reasoned

3  decision).

4  III.  Factual Background

5          The opinion of the California Court of Appeal contains a factual summary.  After

6  independently reviewing the record, the court finds this summary to be accurate and adopts it

7  below:

8          On the afternoon of January 4, 2006, Jade Sprickman telephoned the 911 operator
   and asked for help, stating her ex-boyfriend (defendant) had called and said he
9  was on his way to kill her and her current boyfriend, adding, "Please, please,
   please! ... Hurry, hurry, please!" Gasping, and every intonation freighted with
10 distress, she said that she had just gotten off the phone with defendant, who
   threatened that he was on his way to her house. "He's coming to kill me right now.
11 He's gonna peel me back." When asked where he might be coming from, she said
   that defendant just got out of prison and she had no idea, that he was in a program,
12 a halfway house, but that he had left it two days earlier.

13         Officer Jason Rhoads of the Redding Police Department went to Sprickman's
   apartment. He testified that when he arrived, she was "emotionally upset, crying,
14 and very nervous." After meeting with her for 40 to 50 minutes he left.

15         Sprickman soon telephoned 911 again. She reported that "no more than five
   minutes after the officer left" defendant had come to her door and "banged on [it]
16 twice" about "two seconds ago." She told the dispatcher, "My [three-year-old]
   daughter is here. I need somebody here right now." She asked for help in getting
17 to her car so she could "go to her mom's." Her voice on the 911 tapes conveys
   anxiety and urgency in requesting police assistance to deal with the reported
18 threats from defendant.

19         Officer Rhoads returned and found Sprickman upset, she was crying and very
   nervous, looking up and down the street. Rhoads stood by as she packed and left
20 in her car with her three-year-old daughter.

21         Joaquin Telez, Sprickman's boyfriend, was at her residence on the afternoon of the
   911 calls. He affirmed that someone, whom he believed was defendant, had come
22 to the door and rapped, harder than a regular knock.

23         Leanna Montrees, a friend of Sprickman since childhood, testified, under
   Evidence Code section 1109,FN1 that, on July 30, 2005, about 2:30 a.m.,
24 defendant entered Sprickman's apartment through a window and angrily punched
   Sprickman in the face. When she and Sprickman left, defendant followed them in
25 a car and threatened to run Sprickman over if she did not get into the car.

26         FN1. Undesignated statutory references are to the Evidence Code. Section 1109,

2339bfac

1   subdivision (a)(1) provides: "Except as provided in subdivision (e) or (f), in a
    criminal action in which the defendant is accused of an offense involving
2   domestic violence, evidence of the defendant's commission of other domestic
    violence is not made inadmissible by Section 1101 if the evidence is not
3   inadmissible pursuant to Section 352."

4       Defendant did not testify.

5   Respondent's Lodged Document D, pp. 2-3.

6   IV.  Discussion

7           A.  Confrontation Clause

8           Neither did the victim testify.  Apparently, the victim in this domestic dispute plus

9   situation, as sometimes happens, was showing signs of not wanting to testify.  She recanted her

10  previous statements at the preliminary hearing.  The prosecutor let it be known that the victim

11  could be prosecuted for filing a false claim if the victim's prior testimony were recounted.  The

12  trial judge was informed of this possibility, and the victim's potential need for an attorney.  The

13  victim subsequently refused to testify on Fifth Amendment grounds thereby rendering herself

14  unavailable for trial.  Petitioner objected to use of the taped calls as "testimonial" hearsay,

15  subject to a right of cross-examination/confrontation pursuant to Crawford v. Washington, 547

16  U.S. 36, 124 S.Ct. 1354 (2004).

17          The California Court of Appeal rejected petitioner's Confrontation Clause claim

18  for the following reasons:

19          Defendant principally argues that the calls should have been excluded under the
            confrontation clause because the circumstances show Sprickman made her
20          statements to be used to prosecute him.FN2 We are not persuaded.

21          FN2. Defendant also argues that his claim for a confrontation clause violation is
            enhanced because Sprickman was coerced into claiming her privilege against
22          testifying at trial. It suffices to note that we have rejected the underlying premise,
            above. Moreover, the point was not raised as a part of the constitutional claim
23          below and would be forfeited. (§ 353.)

24          In Crawford v. Washington (2004) 541 U.S. 36, 53-54 [158 L.Ed .2d 177, 194] (
            Crawford ), the United States Supreme Court held that the confrontation clause of
25          the Sixth Amendment bars "admission of testimonial statements of a witness who
            did not appear at trial unless he was unavailable to testify, and the defendant had
26          had a prior opportunity for cross-examination." (Emphasis added.) In Davis v.

                                              5

Washington (2006) 547 U.S. 813 [165 L.Ed.2d 224] ( Davis ), the court applied Crawford to the 911 call context. Davis holds that, in that context, "statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." ( People v. Cage (2007) 40 Cal.4th 965, 984.)

Defendant submits that viewed through the Davis framework, the trial court erred in characterizing Sprickman's 911 statements as nontestimonial. He argues that Sprickman's purpose was revenge and retribution rather than to deal with a contemporaneous emergency. He suggests that we are free to make this determination as part of a de novo review of the totality of the circumstances underlying the constitutional question, citing People v. Cervantes (2004) 118 Cal.App.4th 162, 174-175.FN3

FN3. Defendant also urges a de novo review of Sprickman's motivation under the rubric of trustworthiness. He argues that even if within a firmly rooted hearsay exception for excited utterances, this court "must acknowledge, nonetheless, that the statements lack adequate indicia of reliability, and ought to be excluded on that basis." He points to no objection making this specific ground of objection in the trial court.

The trustworthiness inquiry defendant urges is taken from confrontation clause cases before Davis, which applied the confrontation clause to nontestimonial hearsay and allowed it if it met the criterion of firmly rooted hearsay exceptions or if it was particularly reliable. (See, e.g., Lilly v. Virginia (1999) 527 U.S. 116, 124-125 [144 L.Ed.2d 117, 127].) Defendant's argument fails to note the disjunction, firmly rooted hearsay exceptions were not subject to any independent trustworthiness analysis. More importantly, Davis overturns this aspect of the prior case law. "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." ( Davis, supra, 547 U.S. at p. 821 [165 L.Ed.2d at p. 237].)

We reject the unsupported implication that evidence-admissible under the hearsay exceptions allowed by the common law in 1791, as permitted under Crawford-is subject to further case-by-case exclusion for trustworthiness anytime that it might be useful to be able to cross-examine the hearsay declarant.

The question of Sprickman's motivation is one of historical fact. Even when preliminary to a de novo review of a mixed question of fact and law, where facts are historical, amenable to dispute and resolution by trial fact finding, "a reviewing court must, of course, apply a deferential standard of review to the trial court's factual findings." ( People v. Cromer (2001) 24 Cal.4th 889, 900; see also, e.g., People v. Tatum (2003) 108 Cal.App.4th 288, 296.) Thus, the ordinary presumptions concerning the judgment (see 9 Witkin, Cal. Procedure, supra, § 349, pp. 394-396) apply with respect to the question of Sprickman's state of mind.

In any event, were we free to revisit such facts, after hearing the recording of the calls, we would say that she was calling, in Davis's words, because she was "facing an ongoing emergency." ( Davis, supra, 547 U.S. at p. 827 [165 L.Ed.2d at

1       p. 240.) To continue to borrow from Davis: "Although one might call 911 to
provide a narrative report of a crime absent any imminent danger, [Sprickman's]
2       call was plainly a call for help against a bona fide physical threat. [T]he nature of
what was asked and answered in [this case], again viewed objectively, was such
3       that the elicited statements were necessary to be able to resolve the present
emergency, rather than simply to learn (as in Crawford ) what had happened in the
4       past.... [¶] We conclude from all this that the circumstances of [Sprickman's]
interrogation objectively indicate its primary purpose was to enable police
5       assistance to meet an ongoing emergency." ( Id. at pp. 827-828 [165 L.Ed.2d at p.
240].) The calls were contemporaneous with the ongoing threats and the questions
6       and responses were about information needed to assess the threats and triage the
police response to the reports. Accordingly, the trial court did not err in overruling
7       defendant's Crawford objection.

8  Respondent's Lodged Document D, pp.  6-9.

9       A primary interest secured by the Confrontation Clause of the Sixth Amendment

10  is the right of an accused in a criminal prosecution to cross-examine witnesses against him or

11  her.  See Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S.Ct. 1431 (1986); Davis v. Alaska,

12  415 U.S. 308, 315, 94 S.Ct. 1105 (1974).  In Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct.

13  1354 (2004), the United States Supreme Court held that the Confrontation Clause bars the

14  admission of testimonial hearsay unless the declarant is unavailable and the accused had "a prior

15  opportunity for cross-examination." Statements given to police during interrogations qualify as

16  "testimonial." See id. at 59, 68, 124 S.Ct. 1354. The Crawford holding abrogated, in part, the

17  prior rule that the admission of testimonial hearsay did not violate the Confrontation Clause if the

18  declarant was unavailable and the statement fell under a "firmly rooted hearsay exception" or

19  otherwise bore indicia of reliability.  See Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531

20  (1980).  In Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266 (2006), the Supreme Court

21  observed:

22       Statements are nontestimonial when made in the course of police interrogation
under circumstances objectively indicating that the primary purpose of the
23       interrogation is to enable police assistance to meet an ongoing emergency. They
are testimonial when the circumstances objectively indicate that there is no such
24       ongoing emergency, and that the primary purpose of the interrogation is to
establish or prove past events potentially relevant to later criminal prosecution.

25

26  \\\\\

1      The <u>Davis</u> court addressed statements made by a woman to a 911 operator

2  reporting she had been assaulted.  The statements were found by the Supreme Court to be

3  non-testimonial as the objective circumstances indicated that the "primary purpose" of the police

4  interrogation was to meet an ongoing emergency and was thus not subject to the requirements set

5  forth in Crawford.  <u>Id</u>. at 821-22, 126 S.Ct. 2266.  However, "when the circumstances objectively

6  indicate that there is no such ongoing emergency, and that the primary purpose of the

7  interrogation is to establish or prove past events potentially relevant to later criminal

8  prosecution," those statements would be testimonial and thus their admission would violated a

9  criminal defendant's right under the Confrontation Clause.  <u>Id</u>., 126 S.Ct. 2266.

10      Petitioner argues that Jade's statements to the 911 operator were testimonial

11  because she was not suffering from a real emergency.  Petitioner argues that Jade made a false

12  report against him because she was motivated by revenge and retribution.  In order to analyze this

13  claim, the court has set forth below the transcripts from the two 911 calls.

14      After listening to the tape of the 911 calls, the trial ordered certain portions of the

15  tape excised.  RT at 99-100.  The redacted tape of Jade's 911 calls were played to the jury.  RT at

16  130. A transcript of the redacted tape is contained in the record.  The first 911 call went as

17  follows:

18      CT: 9-1-1 what is your emergency?
        J: Um, my my (inaudible) keeps calling my house telling me he's gonna come
19      over and kill me.  And he said he's on his way, and–
        CT: What's your address?
20      J: Thirty-five-ninety-six Ricardo Avenue.  Um, apartment four.
        CT: Okay.  What's your last name?
21      J: Sprickman.  S-P-R-I-C-K-M-A-N.  He says he's gonna kill my boyfriend.
        CT: What's your first name?
22      J: Jade.
        CT: How far away does he live?
23      J: I don't, he don't live anywhere.  He just got out of prison.  I don't know where
        he's at.
24      CT: What's your phone number?
        J: Um, two-two-four-eleven-seventy-six.
25      CT: And what's his last name?
        J: Gragg, G-R-A-G-G.  I need,
26      CT: What's his first name?

1   J: I need the cops here now.  Carlis.
    CT: Carlos?
2   J: Carlis.  C-A-R-L-I-S.
    CT: Is he white, black, Hispanic, Asian?
3   J: He's white.
    CT: Do you know his date of birth?
4   J: Uh, one-sixteen-seventy-eight.
    CT: Okay.  So when did he call you?
5   J: He, I just got off the phone.  He just hung up on me.  He said he was gonna
    come.  He's coming to kill me right now.  He's gonna peel me back.  Then all
6   that's here is me and my daughter, my three year old.
    CT: Okay.  So we don't know where he might be coming from?
7   J: I don't know where he's at.  He was in a program.  He was in a half-way house
    and he left it like two days ago.
8   CT: Okay.  We'll have officers.
    J: And he's not in the program no more.
9   CT: We'll have officers respond out there.  Okay?
    J: Please.
10  CT: Okay.
    J: Hurry.
11  CT: Okay.
    J: Okay.
12  CT: Bye-bye.
    J.  Bye.
13
14  CT at 196-198.

15          The transcript from the second excised 911 telephone call played to the jury is as

16  follows:

17          CT: 9-1-1, what is your emergency?
    J: Oh my God.  (Inaudible.)  I need the police here right now.
18  CT: What's the address?
    J: Three-five-nine-six Ricardo Avenue.  I need them here right now.  (Inaudible).
19  CT: House or an, house or an apartment?
    J: Oh my God.  (Inaudible.)  It's apartment.  Apartment four.  (Inaudible.)
20  CT: What's going on there?
    J: There, there's somebody trying to get in my house.  (Inaudible.)  I know.  Tell
21  Officer Rhoads I need somebody here right now. He just left here.
    CT: Okay, he just left there?
22  J: Yes, please, please, please.
    CT: Okay.  What's your name?
23  J: Jade.  Hurry. Hurry, please.
    CT: Do you know who's there?
24  J: It's my kids' dad.
    CT: Your kids' dad?
25  J: Yeah.
    CT: Why is he there?
26  J: He's, he threatened to kill me.  He needs to get here now.

9

1   CT: Hold on just a second for me. Okay.  Do you know if he has any weapons?
    J: No.  (Inaudible.)  Probably.
2   CT: What's your last name, Jade?
    J: Sprickman, S-P-R, did you tell him already? S-P-R
3   CT: I've got the information over to the dispatcher.
    J: S-P-R-I-C-K-E-N.
4   CT: Okay.  What's his name?
    J: Carlis Gragg.  I need the police here now.  Please.
5   CT: I have the information over to the dispatcher.  I'm gonna stay on the phone
    with you.  Spell Carlos' last name.
6   J: Carlis, G-R-A-G-G.
    CT: G-R-A-G-G.
7   J: My daughter is here.  I need somebody here right now.
    CT: How do you know it's him?  Did you see him?
8   J: I had (inaudible).  It's him.
    CT: Okay.  Do you see him?
9   J: And he's banging on my door, banging.
    CT: He's banging on your door?  What is Carlos' birthday?
10  J: What's what?
    CT: Carlos' birthday.
11  J: It's Carlis.  C-A-R-L-I-S.
    CT: Carlis.
12  J: One-one, ah, one-sixteen-seventy-eight.  I just called you guys. He's just called
    and told me he's gonna kill me.
13  CT: I understand. He's no longer there.  He's working on another call.  I've got
    the information over to the dispatcher.  Do you remember what Carlis is wearing?
14  J: I just, I just seen a baseball hat on him.
    CT: Okay.
15  J: Inaudible.
    CT: What's your nearest cross-street for Ricardo?
16  J: Ricardo and um, C Street, um, Layton.
    ****
17  CT: Inaudible.
    J: Inaudible.
18  CT: Is anybody else?
    J: He's parked out on the main street. He's parked out on Ricardo, the main street.
19  CT: How long ago was he banging at your door?
    J: Like two seconds ago.  Right when I called.  I just picked up the phone.
20  CT: Is he back in his vehicle?
    J: I don't know.  I'm in my room.  I'm sitting by my daughter.
21  CT: What color vehicle does he drive?
    J: It's a black and silver oxidized like piece of crap Ford Ranger.  Like between
22  eighty-seven and eighty-nine.
    ****
23  CT: Do you still hear him?
    J: No I (inaudible).  No I don't.  He just banged on the door twice and I looked
24  out.  I knew it was him.  I (inaudible) bang.  And I looked out and he was, it was
    him.
25  CT: And his date of birth is one-sixteen of seventy?
    J: Eight.
26  CT: Seventy-eight?

10

J: Uh-huh.

CT: Okay.  (Inaudible) there?

J: Inaudible.

CT: Okay.

J: I'm scared.

CT: You can't hear him anymore?

J: Huh uh.

CT: Do you know why he was there?

J: Because he just called and told me he was coming over to kill me about forty-five minutes ago.

CT: Okay.  And then the officer came out?

J: And then the officer came out and took the report.  And no more than five minutes after the officer left he just started banging.

CT: Okay.

*****

CT: You still there?

J: Yeah, I'm still here.

CT: Okay.  You still in the bedroom?

J: Yeah.

CT: Okay.  And there's nobody else at home besides you and your daughter?

J: There's my friend, my friend's here but I mean he doesn't need to get in the middle.  You know what I mean?

CT: Uh huh.  Do you want me to stay on the phone with you until the officers get there Jade?

J: Um, I would prefer that. Yeah.

CT: Okay.  Not a problem.  Just let me know if you hear anything else.  Is the door locked?

J: Yeah.  I'm locked in, I'm barricaded in here.

CT: Okay.  Why does he want to harm you?

J: Because we, I broke up with him I guess.  I don't know.

CT: Okay.

J: No, I don't.  The police are coming right away.  Why (inaudible).  I mean (inaudible) guarantee.  (Inaudible.)

CT: Okay.

J: You know, (inaudible) long history of this.  Um, is there any way that you can, you know, maybe the police can come here and just so I can walk to my car and leave when they're done if they don't find him?

CT: When the officers get there they'll be able to um, assist with you.

J: Just get me and my daughter the fuck out of this house.

CT: Do you have somewhere safe you can go?

J: Yeah.  My mom's, we can go to my mom's.

CT: Okay.  Does he know where that is?

J: Yeah.  But my dad's got ah, my dad won't let him do anything to me.

CT: Okay.

J: Can't believe this.  What's that noise?  (Inaudible) walking back towards the street.

CT: Has anybody seen him?

J: What?

CT: Has anybody seen him?

J: Um, yeah. My, I seen him and my friend seen him.

CT: I mean since you, when you first called.

J: When I first called?

CT: Uh huh.  Have you seen or heard anything since you first called?

J: No, no, no.  I'm not panicked anymore.  He's, you know if they get a, if they're out on, man.  God he must have just watched Officer Rhoads leave.  Must have just watched him leave and come.  'Cause he, (IA), you know, he's, within a matter of like two minutes he was like, he was banging on the door.  Maybe two minutes.  God I was just getting ready to get in the shower (inaudible).  (Inaudible) baby.  Man I hope they find his ass.  (Inaudible) if they're close or if they got.

CT: I have the information over to the dispatcher.  We don't have an officer available yet.

J: Oh really.

CT: Yeah.

J: Oh man.  (Inaudible) like they just, you know what I mean?

CT: Yeah.

J: I know (inaudible).

CT: I, I understand that he just left but he got dispatched to another call.  So he's handling another in-progress call right now.

J: I realize that.  It's just, sucks for me.  (Inaudible) people out there (inaudible).

****

J: Hi, you ready to go?

Unknown child: Inaudible.

CT: How old is your child?

J: She's three.

CT: She's three?

J: Mmm hmm.

CT: Oh.

J: She was sleeping until all this.

CT: Uh huh.

Unidentified child: Who is that?

J: Who is that?

Unidentified child: Yeah.

J: It's the 9-1-1 lady.

Unidentified Child: Yeah.

J: Yeah.

CT: And we got two officers on the way right now.

J: Oh cool.  (Inaudible). Hold on (inaudible) let's go out in the living room.  There's, there's a police officer.  They're gonna come say hi to us.  My poor kids.  Do you have to go potty?

CT: You haven't seen him since you left?

J: No.

CT: Have you heard anything further?

J: No.

CT: 'Cause the officers are on the way right now.

J: Two big bangs and then we watched him walk out towards Ricardo.

CT: Okay.

J: I live like on the little side streets towards (inaudible) window.  On Ricardo but it's the side.  I don't know.  It's weird.  You just walk up, it's like a long driveway.  And he started walking out towards the road. I have no idea where he parked.  He could have parked like three blocks down you know.

CT: Yeah.  And he's driving the black and silver Ranger?

J: Yeah.  Ford Ranger.

1   CT: Okay.
*****
2   J: Inaudible.
CT: Is she okay?
3   J: Huh?
CT: Is she doing okay?
4   J: Yeah.  She's fine.
CT: Okay.
5   J: (Inaudible) with me.  I want to sit right here.  We're gonna pack our bag.  We're gonna go to grandma's.  Want to go to grandma's?  Yeah.  Oh man.
6   CT: We have two officers on the way for you.  They've been en route about three minutes now.
7   J: Okay.
CT: I don't know exactly where they're coming from but they're on their way.
8   J: Okay.
CT: Okay?  I'll just stay on the phone with you if you want until they get there.
9   J: Okay.
CT: That's not a problem.
10  J: All right.  They'll probably be (inaudible).
CT: Who came out there and did the report from you?
11  J: Officer Rhoads.
CT: Yeah.  One of the officers coming back will be Officer Rhoads.
12  J: Yeah.
CT: And he's gonna have another unit with him.
13  J: Mmm hmm.  Okay.  Oh God I hope they catch him.  Like on the road walking or something.  Hold on.  That would be nice.  I'm just glad my five year old's not
14  here.  (Inaudible.)  That's just clean, cleaner.  God.  (Inaudible.)  I know. (Inaudible.)
15  CT: You doing okay?
J: Yeah.
16  CT: All right.
J: I'm fine. I just, it sucks.  I moved away from him and he found me.  And I can't
17  even stay in my own house.
CT: How long have you been separated from him?
18  J: Um, for probably about six months.  He went to prison and (inaudible) and just got so.
19  CT: Okay.
J: (Inaudible) over the pants so you don't get cold.
20  CT: And you moved since he went to prison?
J: Well I moved like a week after he went to prison.  You know.
21  CT: Uh huh.
J: Funny how the justice system works. But ah, yeah.  And we moved.  And then
22  he followed me from um, he must have followed me from somewhere.  Found out where I lived and it's been horrible ever since.  I'm, I'm sick of it.  My kids, they
23  don't need this tension twenty-four seven.
CT: Mmm hmm.
24  J: Hey babe, can you put these on?  Let's get ready to go.  Put those on.  Those are your Cinderella shoes.
25  Unidentified Child: Inaudible.
J: (Inaudible.)  Okay.  (Inaudible.)  Man.  Man.  You know what they're probably
26  looking for him. So they might not come right here.

13

CT: Yeah I have one officer in the area.
J: There is an officer in the area?
CT: Yeah he's waiting for his second unit.
J: Oh before they come in.
CT: Mmm hmm.
J: Yeah.
CT: Yeah he's in the area.  He'll keep an eye out see if he sees the vehicle.
J: Mmm hmm.  (Inaudible.)  I just, I hope he doesn't have (inaudible).  Did you tell him that he could possible have a gun?
CT: No you didn't say that.
J: Well.
CT: Do you know he carries a gun?
J: Usually.
CT: What type of gun?
J: I have no idea.
CT: He carries it in his vehicle with him?
J: Um, usually it's shoved right down the front of his pants.  And if no, or he stashes it like in, like if he was walking up here it was probably stashed in the bush.  She stashes them.
*****
CT: The officers are in the area.  Is it okay if I um, do you want to stay on the phone with me?
J: No you, I, I can go.  I can go now.
CT: You're okay now?
J: Yeah.
CT: All right.  Thank you Jade.
J: Uh huh.
CT: Bye.

CT at 199-209.

Pursuant to <u>Crawford</u>, <u>supra</u>, and <u>Davis</u>, <u>supra</u>, statements are non-testimonial if made under circumstances *objectively* indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  Jade's statement in the first 911 call that petitioner was on his way to kill her objectively indicates that an ongoing emergency was occurring.  The questions by the 911 operator were designed to resolve the emergency, rather than learn what had happened in the past.  "That is true even of the operator's effort to establish the identify of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon."  <u>Davis</u>, 547 U.S. at 2276, 126 S.Ct. 2266.

The transcript from the second 911 call objectively indicates that an ongoing emergency was occurring up until the point the operator told Jade that she would stay on the

1   phone with her until the police arrived.  While the phone call was made after petitioner had been

2   to her home, she was afraid he would return.  For this reason, the court finds that the beginning

3   of the call objectively indicated an ongoing emergency.  In addition, at the beginning of the call

4   the operator's questions were designed to resolve the emergency.  After the operator told Jade

5   that she would remain on the phone with her until the police arrived, the primary purpose of the

6   interrogation was no longer to enable police assistance to meet an ongoing emergency.  Jade's

7   statements after that point were testimonial.

8           Petitioner argues that there was no ongoing emergency during both 911 calls.

9   Petitioner argues that Jade made false reports because she was motivated by revenge.  In support

10  of this argument, petitioner argues that Jade recanted her 911 statements that he threatened her at

11  the preliminary hearing.  While this is true, it does not change the fact that at the time she made

12  the call the circumstances *objectively* indicated that an ongoing emergency existed.

13          Petitioner next argues that there was no emergency because, before she made the

14  first call, Jade had ample opportunity to remove herself from any threat.  Petitioner argues that

15  she could have gotten in her car and gone to her mother's house.  Petitioner also observes that

16  Jade's statement to the 911 operator that she had a friend with her but that he did not need to get

17  into the middle of it also demonstrated that no emergency existed.  This argument requires too

18  much speculation regarding the circumstances and does not change the fact that the

19  circumstances of the call objectively indicated that an emergency existed.

20          Petitioner also argues that, at trial, Jade's boyfriend testified that Jade did not

21  seem very scared and that she made several dishonest statements during the call.  While all of

22  this may be true, it does not change the fact that the circumstances of the calls objectively

23  indicated that an ongoing emergency existed.[2]

24  ─────────────────

25          [2]  Petitioner's argument that the testimony of Jade's boyfriend demonstrates that Jade
    made dishonest statements to the 911 operator are weak.  Petitioner argues that Jade's statement
    that she was "barricaded in" was dishonest because the boyfriend testified that he did not see her

26  barricaded in any room of the house.  The court does not take Jade's statement to necessarily

15

1    For the reasons discussed above, the court finds that admission of Jade's

2  statements from the first 911 call and the first portion of the second 911 call did not violate the

3  Confrontation Clause because her statements were non-testimonial.

4    Jade's statements from the second portion of the second 911 call were testimonial.

5  Therefore, they were admissible only if petitioner had a prior opportunity to cross-examine her

6  and she was unavailable.  Crawford, supra.  Petitioner had a prior opportunity to cross-examine

7  Jade at his preliminary hearing.  CT at 16-18.  During pretrial proceedings after the preliminary

8  hearing, Jade invoked her Fifth Amendment right against self-incrimination and refused to

9  testify.  RT at 37-38.  The invocation of her Fifth Amendment right against self-incrimination

10  made Jade unavailable.  See Padilla v. Terhune, 309 F.3d 614, 618 (9th Cir. 2002) (applying Fed.

11  R. Evid. 804(a)).  Accordingly, because Jade was unavailable at trial and petitioner had a prior

12  opportunity to cross-examine her, the admission of her testimonial statements did not violate the

13  confrontation clause.

14    Finally, the court observes that even if its finding that Jade's statements during the

15  first 911 call and the first portion of the second 911 call were non-testimonial is in error, their

16  admission as testimonial statements did not violate the Confrontation Clause.

17    Because the denial of this claim by the California Court of Appeal was not an

18  unreasonable application of clearly established Supreme Court authority, this claim is denied.

19    B.  State Law

20    Petitioner argues that the admission of Jade's 911 statements pursuant to the

21  excited utterance exception to the hearsay rule violated state law.

22

23  mean that she was barricaded in a room.  Rather, she may well have meant that she was
    barricaded in her house.  Petitioner also argues that Jade falsely told the operator that there was
24  someone trying to get into her house.  The boyfriend testified that petitioner rapped on the door
    and looked in the window.  Because she was fearful of petitioner, Jade's interpretation of events
25  may have reasonably been different than that of her boyfriend.  Petitioner also argues that Jade
    falsely told the operator during the first call that only her daughter was with her, when her
26  boyfriend was there as well.  While she did say that, Jade did not hide the fact that her boyfriend
    was with her when she made the second call.

1    A writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis

2    of some transgression of federal law binding on the state courts.  Middleton v. Cupp, 768 F.2d

3    1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is

4    unavailable for alleged error in the interpretation or application of state law.  Middleton v. Cupp,

5    768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v.

6    Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state

7    issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178 (1972).

8    The Supreme Court has reiterated the standards of review for a federal habeas

9    court.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475 (1991).  In Estelle v. McGuire, the

10   Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had

11   granted federal habeas relief.  The Court held that the Ninth Circuit erred in concluding that the

12   evidence was incorrectly admitted under state law since, "it is not the province of a federal

13   habeas court to reexamine state court determinations on state law questions."  Id. at 67-68, 112 S.

14   Ct. at 480.  The Court re-emphasized that "federal habeas corpus relief does not lie for error in

15   state law."  Id. at 67, 112 S. Ct. at 480, citing Lewis v. Jeffers, 497 U.S. 764, 110 S. Ct. 3092,

16   3102 (1990), and Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 874-75 (1984) (federal courts

17   may not grant habeas relief where the sole ground presented involves a perceived error of state

18   law, unless said error is so egregious as to amount to a violation of the Due Process or Equal

19   Protection clauses of the Fourteenth Amendment).

20   The Supreme Court further noted that the standard of review for a federal habeas

21   court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

22   the United States (citations omitted)."  Id. at 68, 112 S. Ct. at 480.  The Court also stated that in

23   order for error in the state trial proceedings to reach the level of a due process violation, the error

24   had to be one involving "fundamental fairness," Id. at 73, 112 S. Ct. at 482, and that "we 'have

25   defined the category of infractions that violate "fundamental fairness" very narrowly.'"  Id. at 73,

26   112 S. Ct. at 482.  Habeas review does not lie in a claim that the state court erroneously allowed

1  or excluded particular evidence according to state evidentiary rules.  Jammal v. Van de Kamp,

2  926 F.2d 918, 919 (9th Cir. 1991).

3          Because the court finds no violation of the Confrontation Clause by the admission

4  of Jade's statements to the 911 operator, the court finds any error in admitting these statements

5  pursuant to state law did not violate fundamental fairness.  Because the denial of this claim by

6  the California Court of Appeal was not an unreasonable application of clearly established

7  Supreme Court authority, this claim is denied.

8          Accordingly, IT IS HEREBY ORDERED that petitioner's application for a writ of

9  habeas corpus is denied.

10  DATED: 08/11/09

                                        /s/ Gregory G. Hollows
11
                                        _____
12                                      UNITED STATES MAGISTRATE JUDGE

13  gragg2162.157

14

15

16

17

18

19

20

21

22

23

24

25

26